## HAFF v. DER YAM MIN.
### No. 7126.

Circuit Court of Appeals, Ninth Circuit.

Feb. 5, 1934.

H. H. McPike, U. S. Atty., and Robert L. McWilliams, Asst. U. S. Atty., both of San Francisco, Cal. (Arthur J. Phelan, of San Francisco, Cal., U. S. Immigration Service, on the brief), for appellant.

Stephen M. White, of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from an order granting a petition for a writ of habeas corpus and dis-

charging appellee from the custody of appellant.

Appellee, a native Chinese, sought admission to the United States as the son of Der Wai, whose American citizenship is conceded. The alleged father was married in January, 1916, while on a visit to China, and returned here in May of that year. Appellee, now about seventeen years of age, is alleged to be the offspring of that marriage, and was mentioned as such by the alleged father before the immigration authorities in May, 1922, upon his return from a second trip to China, and again in May, 1929, upon his return from a third trip.

After a hearing upon the question of the claimed relationship, the immigration authorities were not satisfied that appellee is the son of Der Wai, the alleged father, and denied his application for admission. Upon appeal to the Secretary of Labor, the order of exclusion was affirmed. Thereafter habeas corpus proceedings were instituted, and the District Court being of opinion that appellee was illegally restrained of his liberty, ordered his release; followed by this appeal.

█ Certain discrepancies in the testimony of appellee and his supporting witnesses, hereinafter referred to, were relied upon by the immigration authorities in the order of exclusion. In reviewing the case, we must bear in mind the well-settled rule in cases of this character, namely, if there is a possibility of disagreement among reasonable men as to the probative effect of the discrepancies or contradictions in the testimony of the witnesses, the finding of the administrative board will not be disturbed. Chin Wing v. Nagle (C. C. A. 9) 55 F.(2d) 609, 611.

"The conclusions of administrative officers upon issues of fact are invulnerable in the courts, unless it can be said that they could not reasonably have been reached by a fair-minded man, and hence are arbitrary." Chin Share Nging v. Nagle (C. C. A. 9) 27 F.(2d) 848, 849.

With these rules in mind, we proceed to an examination of the record.

In addition to the testimony of the alleged father in 1922 and 1929, upon his return from trips to China, that appellee was his son, appellee was also mentioned as such son in December, 1926, by an alleged uncle and an alleged grandfather when they testified before the immigration officials, and again in July, 1927, by another alleged uncle and an alleged cousin.

The appellee and his supporting witnesses (the alleged father and an alleged uncle) are in accord in their testimony as to much of the family history and the names, ages, and activities of many of the family relatives, lineal and collateral, living and deceased. As summarized in the brief filed in support of the appeal to the Secretary of Labor: "The applicant was questioned concerning between twenty-five and thirty persons, mostly relatives, from his youngest cousin to his paternal great-grandparents. He has given a complete history of all his uncles, their wives, children, ages and present whereabouts. He also gave the dates of their departures for this country and the dates of the visits of the different members of the family to the home village. He has given the dates of various family events, in all about seventeen dates. He has given the distances to eight different places surrounding his home village. Thus, in all he gave fifty-one dates, ages or distances. There are no discrepancies whatever concerning these fifty-one numerals. In addition he has given the names and locations of sixteen villages, markets, ancestral halls and schools and as to these he is also in agreement with his father and uncle."

The discrepancies relied upon by the immigration officials are summarized as follows in the decision of the Secretary of Labor affirming the order of exclusion:

"The alleged father, who was last in China from April, 1927, to May, 1929, and an alleged uncle who was last there from December, 1928 to August, 1930, have appeared to testify. [The hearing was held in October, 1931]. The testimony discloses such discrepancies as the following:

"The alleged father testifies that during his last stay in China his whole family including the applicant slept in the same bedroom, that there are two beds in that room and that he and the applicant occupied the same bed. He testifies further that the other so-called bedroom in the house was used for storage, that there was no bed in that room and that to his knowledge the applicant never slept in that room. The applicant on the other hand testifies that while his father was last at home he slept in this other bedroom and not in the same room as that in which his father and the rest of the family slept. He also testifies that there was only one bed in the room in which his father and the rest of the family slept. * * *

"The alleged father testifies that there are two skylights covered with glass in each bedroom of his and the applicant's home in China, whereas the applicant states that there

are no skylights at all in the bedrooms of his house and further that light can enter from the outside into those bedrooms only through windows in the outside walls.

"The applicant testifies that while his father was last at home and as far back as he can remember his family kept chickens. The alleged father testifies that when he was last in China his family did not keep chickens.

"The applicant says that there is in his home in China a full length photograph of his father, five by eight inches in size, which was taken during his father's last visit in China. The alleged father says that no photograph was taken of him during his last visit in China and that he never had a full length photograph made.

"The applicant's home village is said to consist of three dwelling houses and a social hall. The alleged father testifies that there are three rooms in this building separated by movable partitions of wood which extend only half way to the ceiling and that there were never any permanent partitions inside that building nor any that could be taken for brick partitions. The alleged uncle also testifies that the partitions in that building are movable and do not extend to the ceiling. The applicant testifies that this building consists of two bedrooms, two kitchens and a parlor separated by permanent brick partitions and that there are no movable wooden partitions in the building. * * *

"The applicant is said to have been attending school in an ancestral hall in the neighboring Tong Tin Village in which his alleged father is said to have been born. The alleged father and alleged uncle locate this ancestral hall as the first building on the east side of that village, whereas the applicant locates it on the seventh row from the east. The alleged father's statement that there are four rows of houses between that ancestral hall and his father's house contrasted with the applicant's statement that this ancestral hall is in the next row to that in which his paternal grandfather's house is located makes it impossible to account for this discrepancy as due to a confusion of direction.

"The alleged father testifies that the applicant usually had breakfast before he started to school and that the second meal of the day was served between 2:30 and 3 o'clock in the afternoon when the applicant would come home to eat. He says further that his family had no evening meal and that only two meals were served each day in his home. The applicant testifies that he always went to school before breakfast and came home to get his breakfast at 8 or 8:30 in the morning, that he then returned to school to remain until 2 o'clock when he came home for lunch, that he then returned to school until 4:30 when he returned for supper and that thereafter he again returned to school. He states definitely that three meals were served in his home each day. Also, whereas the alleged father says that the applicant attended school only five days each week, the applicant says that he attended school six days.

"The alleged uncle of the applicant is said to have been married in February, 1929, and both the alleged father and the applicant are said to have attended the wedding. Both the alleged father and uncle testify that a wedding feast was held on the same day as the bride's arrival and after that event. The applicant testifies that no feast was served on the same day as the bride's arrival but that two feasts were held the following day, both of which he attended. The alleged uncle's attempt to explain the disagreement by saying that probably his mother had invited the applicant to come over to his house to have a meal on the day after the wedding does not resolve the difficulty in view of the applicant's testimony that the twenty-five wedding guests participated in the feasts of which he speaks."

It will be noted that these discrepancies relate to matters within the personal knowledge, observation, or participation of the witnesses, and some of them to intimate family matters, such as the number of meals served daily at the home and the time of serving, and the occupants of the beds, as well as the number of beds and bedrooms in the home. On the other hand, the matters upon which the witnesses are in harmony relate, for the most part, solely to historical and descriptive data, dates, and distances. Many of the discrepancies noted are difficult to explain, even if it were within our province to attempt to reconcile them. But, as said by this court in Quock Hoy Ming v. Nagle, 54 F.(2d) 875, 876:

"The question before us, however, is not one of reconciling discrepancies and of arriving at the ultimate truth by weighing the evidence before the Board but merely to determine whether or not the rejection of appellants' testimony has been so arbitrary and unreasonable as to constitute a denial of a fair hearing."

In our opinion, the discrepancies noted not only go far to destroy the probative effect of the testimony upon which the witnesses are in harmony, but are of sufficient importance

to create a substantial doubt as to the claimed relationship. We cannot say therefore that the immigration authorities acted arbitrarily or unfairly in denying appellee admission. The order of the court below is therefore reversed, with instructions to remand appellee to the custody of appellant.